833 So.2d 1268 (2002)
Joe L. BROWN and Mary Brown, Plaintiff-Appellee
v.
James M. EPPINETTE, M.D., Floyd T. Jones, O.D.; and Karen Beene, M.D., Defendant-Appellee.
Louisiana Patients' Compensation Fund, Intervenor-Appellant.
No. 36,405-CA.
Court of Appeal of Louisiana, Second Circuit.
December 18, 2002.
*1269 Brian E. Crawford, Monroe, Jefferson B. Joyce, Baton Rouge, for Appellant.
Johnny E. Dollar, Monroe, for Appellee, Joe Brown & Mary Brown.
David H. Nelson, Monroe, for Appellee, Floyd T. Jones, O.D. and Karen Beene, M.D.
Before BROWN, WILLIAMS and KOSTELKA, JJ.
WILLIAMS, Judge.
The intervenor, Louisiana Patients' Compensation Fund ("LPCF"), appeals a judgment in favor of the plaintiffs, Joe L. Brown and Mary Brown. The jury found that the defendants, Dr. Floyd Jones and Dr. Karen Beene, were each 50% at fault in the death of plaintiffs' son and awarded each plaintiff $300,000 in damages. Pursuant to the Louisiana Medical Malpractice Act, judgment was rendered against each defendant in the amount of $100,000 and against LPCF in the amount of $300,000. For the following reasons, we affirm.

FACTS
On February 26, 1994, Joseph A. Brown ("Brown"), eighteen years old, visited the Glenwood Regional Medical Center ("GRMC") emergency room, complaining of a headache, sore throat and fever. He did not report nausea or blurred vision. Brown was examined by the emergency room physician on duty, Dr. James Eppinette, who did not find any neurological deficits or pharyngeal abscesses. Dr. Eppinette ordered a CT scan, which did not show any abnormalities. A throat culture was not ordered because prior to going to the hospital, Brown had been taking an antibiotic, Amoxicillin, which would have prevented a reliable test result. Dr. Eppinette diagnosed Brown with exudative pharyngitis (sore throat) and prescribed Advil for his headache and fever.
On February 28, 1994, Brown returned to GRMC with complaints of a headache, right eyelid swelling, vomiting and lack of appetite. Dr. Eppinette examined Brown and administered two tests, Kernig's test, in which the patient lies on his back, brings his knees to the chest and straightens the legs, and a Brudzinski's test, where the patient lies on his back and lifts his head. Both tests were negative, indicating a lack of meningeal or nerve root irritation, but not conclusively ruling out meningitis. Dr. Eppinette ordered a complete blood count (CBC) and a test of *1270 internal organ functioning. The CBC results showed a slightly elevated white cell count of 13,000 and an elevated serum glucose level. Dr. Eppinette administered a 500 milligram intramuscular injection of Rocephin, an antibiotic, and prescribed Phenergin and Duricef, an oral antibiotic. Dr. Eppinette did not find any clinical indication of bacterial meningitis.
Four days later, on the morning of March 4, 1994, Brown returned to the GRMC emergency room complaining of continuing right frontal and temporal headache. He reported that in August 1993, he was injured in a rodeo accident that caused fractures to the right side of his face. Brown was seen by Dr. Terri O'Neal, who noted his previous two ER visits. Brown told Dr. O'Neal that he had been taking antibiotics and that his throat was less sore, but that his headache had not improved. Dr. O'Neal was concerned about Brown's severe and persistent headache and contacted Dr. Floyd Jones, the treating physician for Brown's previous accident. Dr. O'Neal recommended a neurological evaluation.
Dr. Jones examined Brown and reviewed an MRI, which showed mucosal thickening of the right ethmoid sinus. Brown's mother had raised a concern about meningitis, but Dr. Jones did not find signs of meningeal irritation. Dr. Jones assessed Brown's condition as a right ethmoid sinusitis. Dr. Jones admitted Brown to the hospital, ordered IV Zinacef, an antibiotic, to treat the sinusitis and requested a neurology consult.
After Brown was admitted, he complained of a worsening headache and chills shortly before he vomited. Brown was placed on an IV and given Zinacef, which could also treat meningitis. Zinacef was the fourth antibiotic administered to Brown since his headache symptoms began. Dr. Jones consulted with Dr. Karen Beene, a neurologist, who reviewed Brown's history and noted that blood test results showed a white cell count of 16,000 at admission. Dr. Beene also noted that Brown's headache was very significant and was worse when he moved around.
At approximately 7:00 p.m. on March 4, 1994, Dr. Beene performed a spinal tap, which produced six cubic centimeters of clear, colorless cerebral spinal fluid ("CSF"). A culture of the CSF produced "no growth" after 72 hours. Dr. Beene wrote instructions that if the culture was negative after three days, the lab should save the sample and extend testing for 7 to 10 days in case there was bacteria present in low numbers in the culture due to a sinus leak. However, the medical record did not contain a report of the results of any additional culture tests.
On March 6, 1994, Dr. Beene noted a CSF white cell count of 23, with normal glucose and protein. She examined Brown, who felt better but continued to have a headache. Dr. Jones and Dr. Beene diagnosed Brown with ethmoid sinusitis. On March 8, 1994, Dr. Beene noted that Brown's condition had improved and reported that he could be discharged the following day. Beene wrote in her notes that "this could have been a parameningeal infection (sinus ethmoid)-versus partially treated meningitis." On March 9, 1994, Brown was discharged with a prescription for Ceclor, an oral antibiotic.
On March 11, 1994, Brown's mother, Mary Brown, awoke to find him gasping for air and bleeding from the nose. Brown was transported by ambulance in a comatose condition to GRMC, where a spinal tap was performed. The CSF showed a white cell count of 10,900, a glucose of 3 and a protein of 803. The hospital's tests of a CSF culture resulted in a "no growth" report. Several hours later, Brown died. In April 1994, a sample of Brown's spinal *1271 fluid was sent to Puckett Laboratories, where a CSF culture produced two organisms, Peptostreptococcus and Prevotella, demonstrating that Brown's death was caused by bacterial meningitis.
Subsequently, the plaintiffs, Joe L. Brown and Mary Brown, the parents of Joseph A. Brown, filed a petition for damages against the defendants, Dr. James Eppinette, Dr. Floyd Jones and Dr. Karen Beene. Dr. Eppinette was dismissed from the action before trial. After a trial, the jury found each defendant 50% at fault in causing the death of plaintiffs' son and awarded each plaintiff $300,000 in damages. Pursuant to the Louisiana Medical Malpractice Act, judgment was rendered against each defendant in the amount of $100,000 and against LPCF in the amount of $300,000. LPCF intervened to appeal the judgment.

DISCUSSION
The defendants contend the jury erred in finding a breach of the standard of care. Defendants argue that the opinion of plaintiffs' medical expert was not substantiated by the evidence presented and cannot provide the basis for the jury's finding.
In order for an expert opinion to be valid and merit much weight, the facts upon which that opinion is based must be substantiated by the record. Russ v. Jones, 580 So.2d 1098 (La.App. 4th Cir. 1991). When the expert opinion is based upon facts not supported by the record, the opinion may be rejected. Perkins v. Entergy Corp., 98-2081 (La.App. 1st Cir.12/28/99), 756 So.2d 388.
In the present case, plaintiffs presented the testimony of Dr. Vivian Kattapong, a board-certified neurologist, who was accepted as an expert. Dr. Kattapong testified that she had reviewed the medical records of Brown's treatment at GRMC in March 1994. Dr. Kattapong opined that Brown showed symptoms and a history consistent with a partially treated bacterial meningitis, which occurs when a person has been given antibiotics in some form that inhibits the growth of bacteria and treats or reduces the infection without completely clearing the condition. Dr. Kattapong further opined that Doctors Beene and Jones did not meet the standard of care in discharging Brown prematurely without providing adequate treatment, and as a result, his condition worsened to a fulminate bacterial meningitis that caused his death.
Defendants contend the chemical testing of Brown's spinal fluid and the findings of the physical examinations did not show the typical signs of bacterial meningitis. Defendants note that the CSF white cells were 96% lymphocytes, which would indicate an inflammatory response to sinusitis, his glucose and protein levels were normal and the spinal fluid culture did not produce bacterial growth. In addition, Brown's neck remained supple, his headache was localized on the right side and his Kernig and Brudzinski tests were negative, findings that are inconsistent with bacterial meningitis.
However, Dr. Kattapong addressed these findings by noting that Brown had taken an oral antibiotic, Amoxicillin, for several days before going to the emergency room, that Dr. Eppinette gave Brown an injection of the antibiotic Rocephin and prescribed another oral antibiotic, Duricef, and that the antibiotic Zinacef was given intravenously to Brown two hours before the spinal tap. Dr. Kattapong opined that the CSF test results were not reliable because Brown had received four different antibiotics through various routes of administration, allowing some of the antibiotics to enter the spinal fluid space. Dr. Kattapong explained that the effect was to *1272 improve Brown's test results, giving the CSF a more normal profile and minimizing the chance to produce bacterial growth in the CSF culture.
In addition, Dr. Kattapong testified that the CSF glucose level cannot be considered in isolation. She explained that a serum glucose level should have been obtained within one hour of the spinal tap to determine if Brown's CSF glucose was within the normal range of 2/3 of serum glucose. Neither Dr. Jones nor Dr. Beene ordered that such a blood test be done at the time. Thus, Dr. Kattapong concluded that without a basis from which to determine the CSF/serum ratio, a physician could not reasonably assume that Brown's CSF glucose level was "normal."
Dr. Kattapong opined that Brown's protein level was "on the high end" for a person of his age and therefore was not normal. Nevertheless, Dr. Kattapong stated that although atypical, a normal protein level was not inconsistent with bacterial meningitis. Regarding the CSF culture, Dr. Kattapong testified that antibiotics inhibit the growth of bacteria and so the report of no growth after 72 hours did not mean bacteria was not present in Brown's CSF culture. She opined that in a situation where antibiotics were given, one cannot rely on a 72-hour report of no growth to rule out bacterial meningitis and that the typical differential between lymphocytes and polys expected with a bacterial infection may not be seen in the situation of a partially treated meningitis.
Regarding the findings of Brown's physical examinations, Dr. Eppinette acknowledged that negative Kernig and Brudzinski tests and a supple neck were not conclusive to rule out bacterial meningitis. Although Dr. Eppinette stated that he would ordinarily expect a global headache with meningitis, the evidence showed that Brown had been taking pain medication which may have relieved his headache except for the area of acute infection, the right ethmoid sinus.
In their brief, defendants challenge Dr. Kattapong's opinion that antibiotics entered Brown's spinal fluid and tainted the CSF test results by asserting the lack of medical studies which either indicate that oral antibiotics will permeate the spinal fluid or specify the length of time required for such drugs to affect the CSF. Dr. Eppinette testified that some oral antibiotics have the potential to cross over the blood/brain barrier, the tissue wall between a blood vessel and the brain, and could possibly enter the spinal fluid. Regarding the question of whether the administered antibiotics were present for a sufficient length of time to affect the spinal fluid, Dr. Eppinette opined that Brown's CSF culture no-growth report was a suspect, tainted test due to the antibiotics introduced before the spinal tap.
Dr. Joaquin Rosales, Jr., a pediatrician and director of GRMC's pediatric intensive care unit, opined that the IV Zinacef could have been a factor in affecting Brown's CSF test results. Dr. Rosales testified that Zinacef and Rocephin will cross the blood/brain barrier and the fact that they were given before the spinal tap should have placed Doctors Beene and Jones on notice that the CSF culture results might not be reliable.
Dr. Lowery Thompson, a neurologist and former partner of Dr. Beene, testified that giving Brown IV antibiotics two hours before the spinal tap "probably increased the probability of a false negative result" of the culture test. Thus, the foregoing testimony shows that Dr. Kattapong was not the only physician who expressed the opinion that the previously administered antibiotics would have been in Brown's body for a sufficient length of time to enter the spinal fluid.
*1273 Nor are we persuaded by the defendants' contention that the test results from the March 11, 1994 spinal tap should have been consistent with the prior CSF test results. The record supports a finding that when the first spinal tap was performed, the bacterial infection was in a low-grade stage and had been inhibited by antibiotics taken by Brown, who then received four days of meningitis-treating intravenous antibiotics, which were stopped by the defendants on March 8, 1994. More than 48 hours then passed before Brown was brought back to the hospital in a coma and the final tap was taken as he was dying. In that time period, the more resistant bacteria not completely treated by the IV Zinacef could have resumed growing unchecked, resulting in the severe infection reflected in the final CSF results.
After reviewing the record, we conclude that there was sufficient medical evidence and testimony presented to support the expert opinion of Dr. Kattapong. Consequently, the jury was not clearly wrong in accepting Dr. Kattapong's testimony. The assignment of error lacks merit.

Liability
The defendants contend the jury erred in finding them at fault in the death of Brown. Defendants argue that plaintiffs failed to meet their burden of proving a breach of the standard of care.
In a malpractice action based on the negligence of a physician who practices in a particular specialty, the plaintiff has the burden of proving the degree of care ordinarily practiced by physicians within the same medical specialty. The plaintiff must also prove that the defendant either lacked that degree of knowledge or skill or failed to use reasonable care and diligence in applying that skill, and that defendant's lack of skill or failure to exercise reasonable care caused plaintiff to suffer injuries that would not otherwise have occurred. LSA-R.S. 9:2794A; Roberts v. Cox, 28,094 (La.App.2d Cir.2/28/96), 669 So.2d 633.
A physician is not held to a standard of absolute precision. Rather, his conduct and judgment are evaluated in terms of reasonableness under then-existing circumstances. Credibility determinations, including the evaluation of expert testimony together with the ultimate issue of whether a plaintiff has satisfied his burden of proof, are factual issues to be resolved by the trier of fact and will not be disturbed on appeal in the absence of manifest error. Roberts v. Cox, supra; Iseah v. E.A. Conway Memorial Hospital, 591 So.2d 767 (La.App. 2d Cir.1991).
In the present case, the parties elicited testimony from the physician witnesses concerning the standard of care applicable to the defendants in treating Brown. Dr. Eppinette testified that Doctors Jones and Beene could reasonably have relied on the CSF lab results, opining that the Zinacef probably would not have changed the spinal fluid chemistry in the time involved and that Jones had not breached the standard of care of a family practitioner in discharging Brown.
Dr. O'Neal, an emergency medicine physician, testified that when Brown appeared at the GRMC emergency room on March 4, 1994, he complained that his headache had not improved since his last visit and that Brown was mildly "photo phobic," or light sensitive. Dr. O'Neal stated that if meningitis or partially treated bacterial meningitis are part of the differential diagnosis, the standard of care requires a thorough physical examination, lab work and a careful evaluation of the patient to determine if meningitis is likely and if so, the condition should be treated. Doctors Rosales and Eppinette agreed that if Dr. Jones and Dr. Beene believed they were *1274 treating meningitis, then they breached the standard of care in discharging Brown.
Dr. Karen Beene testified that after she had examined Brown and reviewed the MRI showing fluid in the right ethmoid sinus, she thought ethmoid sinusitis might be the cause of Brown's symptoms, but also considered meningitis as a possibility. Dr. Beene stated that she was aware that Brown had received IV antibiotics 1½ hours prior to the spinal tap, but did not think the results were unreliable because of her belief that the antibiotic would take a longer period to enter the spinal fluid.
Dr. Beene testified that the presence of 23 white cells in the CSF was "technically" above the normal range, but less than she would expect for bacterial meningitis. Dr. Beene opined that the CSF lab results did not show a probability of meningitis, but demonstrated a parameningeal reaction due to the sinus infection in close proximity to the meninges. Dr. Beene testified that she had instructed the lab, in the situation where the 72-hour culture report was negative, to hold Brown's CSF cultures for seven to ten days to check for bacterial growth related to a possible CSF leak, but that she never heard a reply or followed up on the cultures.
Dr. Beene stated that she did not consider any effect of the IV antibiotic as significant and had relied on the 72-hour culture report of no growth as evidence there likely was not an infection of the meninges. Dr. Beene testified that she had considered the possibility of bacterial meningitis, but after the lab results and Brown's response to antibiotics, she believed the most likely diagnosis was ethmoid sinusitis and that discharge was appropriate.
Dr. Floyd Jones, a family practitioner, testified that he was contacted by Dr. O'Neal regarding Brown's condition and that after a physical exam, he admitted Brown for a neurological consult. Dr. Jones stated that based upon the information at the time, his assessment was right ethmoid sinusitis with a possibility of meningitis, but the plan was to treat the sinuses. Dr. Jones testified that when he ordered Brown be given IV Zinacef, he did not consider it a "meningitis drug" and did not think the antibiotic would make the spinal tap results unreliable.
Dr. Jones acknowledged that the CSF white cell count was mildly elevated, but stated that since he already believed that sinusitis was a "good" diagnosis to explain Brown's condition, the 23 white cell count seemed reasonable along with the other lab and clinical findings. Dr. Jones testified that he relied on the CSF glucose reading as normal, that he did not think the Zinacef made a significant impact on Brown's spinal fluid and opined that the culture report of no growth after 72 hours indicated that there was no medical probability of bacterial meningitis. Dr. Jones stated that he discontinued the IV antibiotic on the evening of March 8, 1994, and approved Brown's discharge even though the sinusitis was not completely cleared. Dr. Jones agreed that Brown received sufficient doses of Zinacef to begin to treat bacterial meningitis, if it were present.
Defendants contend that Brown did not show any of the classic symptoms of bacterial meningitis, such as rigid neck, brain swelling, elevated white cell count or abnormal glucose and protein levels. However, the testimony demonstrated that Brown showed other symptoms of meningitis. Dr. Eppinette testified that Brown complained of vomiting and a sore throat. Dr. O'Neal reported that Brown was photo phobic and had experienced a severe and continuing headache. Further, each physician recognized that the white cell count was not normal.
*1275 The trial testimony showed that prior to the March 4, 1994 spinal tap, Dr. Jones ordered that Brown be given intravenous antibiotics and that Dr. Beene was aware this medication was administered. However, neither physician took into account the potential inhibitory effect of the antibiotics in relying on the 72-hour culture report of no growth as evidence that bacteria were not present in Brown's spinal fluid. Their decision was contrary to the opinion of other physicians, including Doctors Eppinette, Rosales, Thompson and Daniel, all of whom cautioned that the presence of the antibiotics prior to the spinal tap could have tainted the reliability of the CSF culture results.
In addition, both Dr. Jones and Dr. Beene accepted Brown's CSF glucose readings as normal, even though they failed to have a blood test done within one hour of the spinal tap in order to obtain a serum glucose level with which to compare the CSF glucose. The testimony indicated that without this information, the defendants did not have a sufficient basis to support an interpretation of the CSF glucose level as "normal." Other physicians stated that another factor that should have been considered in evaluating the CSF glucose level was the fact that Brown had received IV glucose throughout the day of the spinal tap.
Dr. Thompson testified that the peptostreptococcus, which is found in the sinuses and was grown in culture after Brown's death, was the same organism that caused his bacterial meningitis. Dr. Thompson acknowledged that the bacteria could have already entered Brown's CSF at the time of the spinal tap, but he did not believe that had occurred. Further, Dr. Rosales opined that it was possible a partially treated bacterial meningitis of prevotella or peptostreptococcus origin could grow to a fulminate stage and cause death over a period of 30 to 40 hours after intravenous antibiotics were discontinued.
The evidence also showed that Dr. Beene, in response to the potential presence of slow-growing bacteria, requested that the lab hold Brown's CSF culture for seven to ten days if the 72-hour report was negative. However, the defendants discharged Brown before another culture report was due.
Dr. Kattapong testified that the CSF white-cell count of 23 was not normal, a fact recognized by the other physician witnesses, and was an indication that Brown's infection had extended into the meninges, causing inflammation consistent with a low-grade bacterial infection proceeding from the sinuses. Dr. Kattapong stated that this was a very dangerous condition which ultimately developed into fulminate bacterial meningitis.
The jury heard the conflicting medical testimony and weighed the credibility of the witnesses. The parties presented competing theories as to the meaning of the evidence and the reasonableness of the medical decisions of the defendants. Based upon this record, the jury could reasonably have found that Dr. Jones and Dr. Beene breached the standard of care by ruling out meningitis as a diagnosis without adequately evaluating the patient's condition in light of the information available and by prematurely discharging Brown from the hospital before providing the appropriate antibiotic treatment for bacterial meningitis. Consequently, we cannot say the jury was clearly wrong in its evaluation of the expert testimony or in its choice between conflicting interpretations of the medical evidence. Thus, the assignment of error lacks merit.

CONCLUSION
For the foregoing reasons, the trial court's judgment is affirmed. The costs of *1276 this appeal are assessed to the appellant, Louisiana Patients' Compensation Fund.
AFFIRMED.