851 So.2d 1194 (2003)
William ALCORN
v.
CITY OF BATON ROUGE, through the Baton Rouge Police Department.
Albert Burns
v.
City of Baton Rouge, through the Baton Rouge Police Department.
Nos. 2002 CA 0952, 2002 CA 0953.
Court of Appeal of Louisiana, First Circuit.
June 27, 2003.
Rehearing Denied August 25, 2003.
*1198 Jill L. Craft, Baton Rouge, Counsel for Plaintiffs/Appellees, William Alcorn and Albert Burns.
Arlene C. Edwards, Baton Rouge, Counsel for Defendant/Appellant, City of Baton Rouge, through The Baton Rouge Police Department.
Before: FOIL, McCLENDON and KLINE,[1] JJ.
McCLENDON, J.
This case involves allegations of workplace racism directed at two African-American *1199 police officers employed by the Baton Rouge Police Department. By virtue of this appeal, the City of Baton Rouge, through the Baton Rouge Police Department (hereinafter "the City") contests a judgment awarding damages to said retired police officers for claims of racial discrimination, racial harassment and unlawful retaliation. For the following reasons, we reverse in part and affirm in part.

FACTS AND PROCEDURAL HISTORY
Albert Burns, Sr., an African-American male, joined the Baton Rouge Police Department as a police officer in 1972 and retired in 1998. He filed suit against the City on October 9, 1996, alleging age discrimination, race discrimination and racial harassment.[2]
In 1973, William Duplessis Alcorn, Jr., an African-American male, joined the Baton Rouge Police Department as a police officer. Mr. Alcorn retired in 1993 due to disability. Mr. Alcorn sued the City on September 24, 1996, alleging age and race discrimination, as well as racial harassment. Additionally, Mr. Alcorn alleged unlawful retaliation.
The suits were consolidated for trial. On May 13, 1999, the City filed a motion for summary judgment, asserting the claims were prescribed. The trial court granted the motion and rendered judgment, dismissing both plaintiffs' claims in their entirety. The plaintiffs appealed that judgment. On appeal, this court affirmed the dismissal of the claims of age discrimination, determined that summary judgment was inappropriate as to the claim of retaliation and the claims of racial discrimination and harassment, and remanded the case for trial of those issues. Alcorn v. City of Baton Rouge c/w Burns v. City of Baton Rouge, 99-2464, 99-2465 (La.App. 1 Cir. 11/3/00) (unpublished opinion).
The matter was tried before a jury on January 7-14, 2002. After trial, the jury entered a verdict in favor of the plaintiffs. The trial court rendered judgment in accordance with that verdict, awarding Mr. Alcorn $300,000 for race-based harassment, $200,000 for racial discrimination, and $50,000 for unlawful retaliation. It further rendered judgment in favor of Mr. Burns in the sums of $300,000 for race-based harassment and $200,000 for racial discrimination. The City appeals.

PRESCRIPTION
On appeal, the City asserts that the plaintiffs' claims of racial harassment and discrimination have prescribed. However, the City did not file an exception of prescription in the trial court or in this court. See LSA-C.C.P. arts. 927, 928 B, and 2163. Rather, it filed a motion for summary judgment prior to the commencement of trial, asserting therein that the matters before the trial court had prescribed. From a judgment granting the motion and dismissing the plaintiffs' claims in their entirety, the plaintiffs appealed. This court affirmed the dismissal of the plaintiffs' claims of age discrimination, reversed the dismissal of the plaintiffs' remaining claims,[3] and remanded the case for trial of *1200 the remaining claims. Alcorn v. City of Baton Rouge c/w Burns v. City of Baton Rouge, 99-2464, 99-2465 (La.App. 1 Cir. 11/3/00) (unpublished opinion). The City did not seek review of our decision at the Louisiana Supreme Court. The unsuccessful assertion that the claims of racial discrimination, harassment and retaliation were untimely as grounds for seeking a summary judgment prior to the trial on the merits does not provide a procedural vehicle for appellate review of the issue of prescription on the entire record, an issue not considered by the trial court.
Furthermore, assigning as error on appeal that the actions have prescribed is also insufficient to raise the issue, which must be presented in a formal pleading. LaBove v. Resource Transp. Co., 625 So.2d 583, 587 (La.App. 3 Cir.1993). Therefore, the defendant failed to properly raise an exception of prescription either before the trial court or before this court. For these reasons, we do not reach the issue of prescription.

JURY CHARGES AND VERDICT FORM
The jury awarded each plaintiff damages for his claim of discrimination. On appeal, the City asserts that parts of the jury instructions and the jury interrogatories inaccurately present the claim of discrimination to the jury. At issue is the following excerpt from the jury instructions:
To prevail on a claim for discrimination, each plaintiff must prove that: 1) he was denied promotional opportunities, or opportunities for advancement, and/or was excluded from training, and 2) race was a motivating factor in the employer's decision to deny those opportunities.
* * *
If you find that the plaintiffs have proved each of these elements in support of their claims, you will then consider whether the defendant has shown by a preponderance of the evidence that the plaintiffs would not have been promoted or given additional training for other reasons apart from the plaintiffs' race. An employer may fail to promote and deny training to an employee for any reason, good or bad, in its business judgment as long as the decision was made without a discriminatory motive.
If you find that the defendant has proved by a preponderance of the evidence that it had a non-discriminatory explanation for its decision, you will then consider whether the plaintiff has shown by a preponderance of the evidence that the legitimate reasons offered by the defendant were not its true reasons, but were a pretext for discrimination. If you do not believe the reasons put forth by the defendant, you are permitted, but not compelled, to infer that the defendant's actions constituted intentional discrimination. If you find the defendant's explanation to be false, you may reasonably infer that it is attempting to cover up a discriminatory purpose and may find the defendant liable to Mr. Alcorn and/or Mr. Burns for discrimination.
The portions of the verdict form at issue with respect to both Mr. Burns and Mr. Alcorn also concern their claims of discrimination. In all essential aspects, the questions and answers are identical in both sets of questions. Therefore, we will include only one set of the pertinent questions in this opinion. The pertinent parts of the jury verdict form provide:

B. DISCRIMINATION
8. Was Mr. Alcorn denied promotional opportunities, or opportunities for advancement, and/or was he excluded from training?
YES XXX (12-0) NO

*1201 (If your answer was "YES", proceed to Question 9 If your answer was "NO", skip to Question 11)
9. Was Mr. Alcorn's race a motivating or determinative factor that prompted the Baton Rouge Police Department to take action?
YES XXX (12-0) NO
(If your answer is "YES", proceed to Question 10 If your answer is "NO", skip to Question 11)
10. What amount, if any, will fairly compensate Mr. Alcorn for damages resulting from racial discrimination? $200,00.00
The City avers that the jury instructions constitutes plain error as they erroneously characterize the plaintiffs' allegations of discrimination as claims for the denial of promotional opportunities and the exclusion of training, without stating that such are not necessarily actionable under Title VII as tangible employment actions and that the employer may provide a legitimate reason for the denials, which if not found to be pretextual, absolves them from liability. The City also asserts that the jury interrogatories form erroneously failed to provide the jury with a question concerning pretext.
It is undisputed that the City did not object to the jury instruction or to the jury interrogatories at trial. It is well settled that a party cannot claim improper jury charges as error where he fails to timely object to the charges. LSA-C.C.P. art. 1793; Level v. Calais & Sons, Inc., 514 So.2d 153, 156-7 (La.App. 5 Cir.1987). This rule applies to jury interrogatories. State, Dept. of Transp. and Dev. v. McMillion Dozer Serv., Inc., 93-590, p. 3 (La. App. 5 Cir. 5/31/94), 639 So.2d 766, 768, writs denied, 94-2345, 94-2348 (La.11/29/94), 646 So.2d 399; Keith v. Gallioto, 592 So.2d 510, 512 (La.App. 5 Cir. 1991). Therefore, in most circumstances, the City would be procedurally barred from appellate review of said jury instructions and interrogatories.
However, courts have held that where the jury instructions or interrogatories contain a "plain and fundamental" error, the contemporaneous objection requirement is relaxed and appellate review is not prohibited. Berg v. Zummo, 00-1699, p. 13 (La.4/25/01), 786 So.2d 708, 716 n. 5; Trans-Global Alloy Ltd. v. First Nat'l Bank, 583 So.2d 443, 448 (La.1991). The adequacy of the instruction "must be determined in light of the instruction as a whole." Belle Pass Terminal, Inc. v. Jolin, Inc., 92-1554, p. 36 (La.App. 1 Cir. 3/11/94), 634 So.2d 466, 488, writ denied, 94-0906 (La.6/17/94), 638 So.2d 1094. Jury charges will be considered adequate on appeal if they fairly and reasonably identify the issues and provide correct principles of law. Johnson v. Terrebonne Parish Sheriff's Office, 95-1180, p. 7 (La.App. 1 Cir. 2/23/96), 669 So.2d 577, 582, writ denied, 96-0727 (La.4/26/96), 672 So.2d 907. A jury verdict shall not be set aside because of an incorrect jury instruction absent a showing of prejudice such that the jury was misled and was unable to render a just verdict. Hanley v. Doctors Hosp. of Shreveport, 35,527, p. 21 (La.App. 2 Cir. 6/6/02), 821 So.2d 508, 523.
Assuming arguendo that the City's objections to the jury instructions and interrogatories were not barred, it has failed to show that they were so erroneous and prejudicial as to justify a de novo review on this case. The standard of proof required for a claim of race-based discrimination is whether race was a motivating factor in an employer's decision to deny promotion opportunities, to deny opportunities for advancement, or to exclude from training. On appeal, the City asserts solely that the verdict form did not include a question regarding "legitimate reasons" for the City's actions. However, the trial *1202 court, in its jury instructions, stated that if the defendant proved the plaintiffs would not have been promoted or given training for reasons apart from the plaintiffs' race, the jury could reject the plaintiffs' discrimination claims. The trial court also instructed the jury on a finding of a non-discriminatory explanation for its decision and the plaintiffs' showing of pretext, as well as the inference of discriminatory intent. Therefore, we find that the City failed to show that the instructions given and the verdict form used constituted "plain and fundamental" error requiring the relaxation of the requirements of LSA-C.C.P. art. 1793.

EVIDENTIARY MATTERS
On appeal, the City asserts that the trial court erred in excluding evidence of the 1988 policy of the City regarding race-based harassment and in including the testimony of two plaintiffs' witnesses, Moses Evans, Sr. and Moses Evans, Jr. Article 103(A) of the Louisiana Code of Evidence governs evidentiary rulings and provides, in pertinent part, that "[e]rror may not be predicated upon a ruling which admits or excludes evidence unless a substantial right of the party is affected." The proper inquiry for determining whether a party was prejudiced by a trial court's alleged erroneous ruling is whether the alleged error, when compared to the entire record, had a "substantial effect" on the outcome of the case. If the effect of the outcome of the case is not substantial, reversal is not warranted. Emery v. Owens-Corporation, 00-2144, p. 7 (La.App. 1 Cir. 11/9/01), 813 So.2d 441, 449, writ denied, 02-0635 (La.5/10/02), 815 So.2d 842. A reviewing court is prohibited from reversing a harmless error. Preatto v. Tidewater Marine, Inc., 00-0624, p. 11 (La. App. 4 Cir. 2/6/02), 809 So.2d 1084, 1091, writ denied, 02-0678 (La.5/3/02), 815 So.2d 822. The burden of proof lies with the defendant. Emery v. Owens-Corporation, 00-2144, p. 7 (La.App. 1 Cir. 11/9/01), 813 So.2d 441, 449.

a. Exclusion of evidence regarding the 1988 policy of the City prohibiting racial harassment
During discovery, the City provided the plaintiffs with its 1994 policy regarding race-based harassment. The trial began on January 7, 2002 at 1:30 p.m. The following day, the City sought to introduce its 1988 policy prohibiting race-based harassment, asserting that it was inadvertently omitted from its pretrial order. The trial court refused to allow the policy to be admitted. On appeal, the City contends the trial court erred in not allowing it to introduce evidence of the 1988 policy or question the plaintiffs regarding said policy.
At trial, various witnesses attested to the fact that a policy prohibiting race-based harassment and setting forth a mechanism for addressing those issues existed prior to the 1994 policy. Hence, without reaching the issue of the admissibility of the 1988 policy, we conclude that any error the trial court may have committed in excluding the 1988 policy was harmless. Therefore, the trial court's refusal to admit the 1988 policy, if in error, is insufficient to warrant interdiction of the jury's verdict.

b. Inclusion of the testimony of Moses Evans, Sr. and Moses Evans, Jr.
Moses Evans, Sr. and Moses Evans, Jr., both past Baton Rouge police officers, testified on behalf of the plaintiffs, providing examples of racial discrimination and harassment each allegedly experienced while employed by the City. On appeal, the City avers that the trial court erred in allowing such evidence in support of the plaintiffs' claims as the evidence did not *1203 concern similarly situated employees in nearly identical circumstances, citing Wyvill v. United Companies Life Ins. Co., 212 F.3d 296 (5th Cir.2000), cert. denied, 531 U.S. 1145, 121 S.Ct. 1081, 148 L.Ed.2d 957 (2001).
Based on our review of the record, we find that the testimony of these witnesses regarding their experiences did not have a substantial effect on the outcome of the case. In the record, there is ample evidence to support the jury's verdict without consideration of this testimony. Therefore, we reject the City's contention that this evidence was "highly prejudicial." Rather, the testimony of the Evanses merely corroborated the plaintiffs' testimony regarding a racially hostile environment and race-based discrimination. We find that any error in admitting this testimony was harmless and, therefore, is insufficient to warrant interdiction of the jury's verdict.

THE CITY'S LIABILITY TO MR. ALCORN FOR UNLAWFUL RETALIATION
In his petition, Mr. Alcorn alleged that the City retaliated against him for filing a claim with the EEOC in two ways: 1) he was denied a promotion to the position of head of the Internal Affairs Division; and 2) his pay was docked for participating in a deposition associated with this litigation. The jury awarded him $50,000 for unlawful retaliation. On appeal, the City contends the evidence does not support the jury's finding that Mr. Alcorn suffered any action in retaliation for filing his EEOC claim.
The Anti-Retaliation Provision of Title VII makes it unlawful for a employer to discriminate against any employee because the employee engaged in protected activity. 42 U.S.C. § 2000e-3(a). To establish a prima facie case for retaliation, the plaintiff must prove by a preponderance of the evidence that: (1) he engaged in an activity protected by Title VII; (2) an adverse employment action occurred; and (3) a causal link existed between the protected activity and the adverse employment action. Barrow v. New Orleans S.S. Ass'n, 10 F.3d 292, 298 (5th Cir.1994), citing Shirley v. Chrysler First, Inc., 970 F.2d 39, 42 (5th Cir.1992). The filing of a charge of discrimination with the EEOC is a protected activity. 42 U.S.C. § 2000e-3(a). Adverse employment actions include "hiring, granting leave, discharging, promoting, and compensating." Mattern v. Eastman Kodak Co., 104 F.3d 702, 707 (5th Cir.1997). Once the plaintiff establishes a prima facie case of retaliation, the burden of production shifts to the defendant to articulate a legitimate, non-retaliatory reason for the adverse employment action. Long v. Eastfield College, 88 F.3d 300, 305 (5th Cir.1996). If the defendant introduces evidence that, if true, would permit the conclusion that the adverse action was non-discriminatory, the employee assumes the burden of proving that the reasons given were a pretext for retaliation. The plaintiff must show that "but for" the protected activity, the termination would not have occurred. McMillan v. Rust College, Inc., 710 F.2d 1112, 1116 (5th Cir.1983); Hanley v. Doctors Hosp. of Shreveport, 35,527, p. 14 (La.App. 2 Cir. 6/6/02), 821 So.2d 508, 520.
The first alleged retaliatory act was the docking of Mr. Alcorn's pay for participating in a deposition associated with this case. At trial, Mr. Alcorn admitted that he was not the deponent, he was on duty at the time of the deposition, he did not give his supervisor a leave or vacation slip, and he failed to get his supervisor's permission. Mr. Alcorn also admitted that he was required by his employer to fill out a vacation or leave slip when on duty and taking care of personal business. *1204 Nevertheless, Mr. Alcorn testified that he believed his pay was docked in retaliation for filing this suit.
Mr. Alcorn's supervisor, Lieutenant Bob Dickerson, testified that Mr. Alcorn was away from the office without permission in violation of the police department's policy. Chief of Police Greg Phares testified that Mr. Alcorn was required by police department policy to obtain approval if he was going to be away from the office on personal business for an hour or longer. Therefore, although Mr. Alcorn testified that he believed his pay was docked in retaliation for filing the EEOC claim or this lawsuit, he produced no evidence to support this claim.
The second alleged retaliatory incident was the failure of the Chief of Police to appoint Mr. Alcorn to the position of head of the Internal Affairs Division after he filed a claim with the EEOC. In the early 1990's, Lieutenant Fred Gernant, the head of the Internal Affairs Division retired, leaving his position vacant. Chief Phares considered, among others, Mr. Alcorn and Lieutenant Dickerson for the position. He appointed Lieutenant Dickerson to the position. Although Mr. Alcorn admitted that he and Lieutenant Dickerson held the same qualifications for the position, he testified that he believed he did not receive the promotion because of his pending EEOC charge.
Chief Phares testified that he appointed Lieutenant Dickerson because he believed that Lieutenant Dickerson would perform the functions of that job better than Mr. Alcorn. In addition, the Chief testified that Mr. Alcorn had missed a lot of work, while Lieutenant Dickerson had a good attendance record, which was necessary to the orderly functioning of this division.
The City put forth legitimate, non-retaliatory reasons for the failure to appoint Mr. Alcorn to the position of Internal Affairs commander and for the action taken regarding Mr. Alcorn's attendance of the deposition without taking leave. Mr. Alcorn did not put forth any evidence to show that the actions would not have occurred "but for" a retaliatory motive. We conclude, therefore, that the jury erred in concluding that Mr. Alcorn experienced unlawful retaliation and will reverse the award for damages for that claim.

THE CITY'S LIABILITY TO MR. BURNS AND MR. ALCORN FOR RACE-BASED HARASSMENT[4]
On appeal, the City challenges the jury's determination that the plaintiffs suffered race-based harassment. To prevail on a race-based harassment claim alleging hostile working environment, the plaintiffs must prove: 1) they belong to a protected class; 2) they were subjected to unwelcome harassment; 3) the harassment complained of was based on race; 4) the harassment complained of affected a term, condition, or privilege of employment; and 5) the employer knew or should have known of the harassment in question and failed to take prompt remedial action. Ramsey v. Henderson, 286 F.3d 264, 268 (5th Cir.2002); Celestine v. Petroleos de Venezuella SA, 266 F.3d 343, 353 (5th Cir.2001). Where the harassment is allegedly committed by a supervisor with immediate or successively higher authority over the harassment victim, the employee needs to satisfy only *1205 the first four elements. Furthermore, an employer may raise an affirmative defense by showing that it exercised reasonable care to prevent and promptly correct any harassing behavior and that the employee unreasonably failed to take advantage of any preventive or corrective opportunities provided by the employer. However, this affirmative defense is available to employers only when the supervisor's harassment does not culminate in a tangible employment action against an employee, such as discharge, demotion, or undesirable reassignment. Faragher v. City of Boca Raton, 524 U.S. 775, 808, 118 S.Ct. 2275, 2293, 141 L.Ed.2d 662 (1998).
For harassment on the basis of race to affect a term, condition, or privilege of employment, as required to support a hostile work environment claim under Title VII, it must be "sufficiently severe or pervasive to alter the conditions of the victim's employment and create an abusive working environment." Harris v. Forklift Systems, Inc., 510 U.S. 17, 21, 114 S.Ct. 367, 370, 126 L.Ed.2d 295 (1993). In determining whether a workplace constitutes a hostile work environment, courts must consider the following circumstances: "the frequency of the discriminatory conduct; its severity; whether it is physically threatening or humiliating, or a mere offensive utterance; and whether it unreasonably interferes with an employee's work performance." Harris v. Forklift Systems, Inc., 510 U.S. 17, 23, 114 S.Ct. 367, 371, 126 L.Ed.2d 295 (1993).

a. Mr. Alcorn's testimony
Mr. Alcorn testified at trial as follows. He entered the police academy on February 16, 1973. At the academy, it was obvious that there were two classes of police officers, a black class and a white class. During physical training, he could outrun everyone, but he received no awards at graduation. He heard many racial slurs on the police radio, and he was always paired with a black officer for pretend combat.
Within a week of his first assignment, he heard a voice on the police radio that he did not recognize state, "There's a bunch of niggers over here on Government Street. Send somebody over here to clear them out." Also, there were two types of marked vehicles, units for white officers and units for black officers. He was assigned to the worst shift, 11 p.m. to 7 a.m., the entire time. White officers rotated off that shift.
He, then, transferred to the newly created burglary division. While there, unlike white officers, he was required to complete his reports after he clocked out. He stayed with the burglary unit for approximately one year and, then, transferred because his sergeant was a racist.
At a subsequent assignment, the officers were taken to the parking lot and told to line up. One officer said he was not "going to put his back to niggerville." At that, Alcorn stepped out of line and told the sergeant that he did not appreciate that comment. The sergeant told Alcorn to leave his feelings at home. After a couple of weeks, he transferred to another station where he worked as a deskman or radioman, while all the other officers were in the field. While there, a lieutenant told Mr. Alcorn, "Alcorn, you're not a nigger no more, you're a Baton Rouge police officer." He transferred again.
At one point, Mr. Alcorn was assigned to work with a white officer. The white officer told Alcorn that the only reason he was riding "with a nigger" was because he was being punished. After three days, Alcorn refused to ride with this individual because he used the word "nigger."
Subsequently, he transferred to the Juvenile Division. The lieutenant there stated *1206 that he was not a racist and that he was very friendly with "coloreds." Black officers were not paired with white officers. If a black officer did not come to work, his riding partner would usually be sent home rather than paired with a white officer. He applied to attend the training three times, but never attended. On one occasion, the chief of police approved his request, but a white officer went in his place.
Upon leaving the Juvenile Division in 1984, he went to Internal Affairs, where he remained for approximately eleven years. In Internal Affairs, Alcorn dealt almost daily with Deputy Chief Phillips, who was second in command. On a daily basis, Deputy Chief Phillips made some type of comment about race.
Before Lieutenant Dickerson replaced Lieutenant Gernant as head of Internal Affairs, Lieutenant Dickerson told Mr. Alcorn that he was going to be "H.N.I.C., head nigger in charge." In the 1990's, Chief Deputy Phillips referred to Mr. Alcorn and the other African-American officers in Internal Affairs as "coons" and "jigaboos." Mr. Alcorn expressed dissatisfaction with this, but nothing changed. He also told Pat Englade, Chief Phares' Chief of Staff, of Deputy Chief Phillips' racist comments, with no result. Then, he told Chief Phares, who took no action.
Mr. Alcorn left Internal Affairs because he could not work with Lieutenant Dickerson and Deputy Chief Phillips. Prior to going to Internal Affairs, he loved his job. Also, while in Internal Affairs, Mr. Alcorn, Lieutenant Dickerson and Lieutenant Gernant smoked together and told jokes, some of which were about African-Americans. Mr. Alcorn admitted that he, too, told jokes about African-Americans.
Then, Mr. Alcorn transferred to Community Services as commander with nine officers reporting to him. He stayed for about one year and then, in 1997, transferred to the Fourth District as a shift lieutenant. While in Community Services and at the Fourth District, he experienced no harassment.
Next, he went to the First District as a district commander. There, he was exposed to "nigger jokes" and "racist comments." Mr. Alcorn asked those offending officers to stop the jokes, but they did not. Mr. Alcorn reported these occurrences to his superior, but nothing happened. Mr. Alcorn left that position in 1995, because he "had had enough of the attitudes of the police department."
While employed by the City, Mr. Alcorn also spent many years on the SWAT team. When he first joined in 1974, white officers could go to any schools they wanted to attend, but black officers only went to schools that all officers attended. After he made sergeant, he applied for the FBI Academy, but they sent a white female. The next time he applied, he was rejected. In the 1990's, when he applied, they sent a younger officer.
While at the SWAT team's youth camp, one SWAT team member wore a shirt with a Ku Klux Klan rider on it. Mr. Alcorn complained to his supervisor, who did nothing. He, then, complained to Lieutenant Vernice Breaux, who told the officer to take off the shirt. Members of the SWAT team also called black officers "night riders."
After the mid-1980's, the only occurrence was a comment made by an officer who said that he was being punished and had to ride with "niggers." Also, he heard the word "nigger" on the police radio up until the mid-1980's.17 The last direct comment made to Mr. Alcorn concerning race occurred in the mid-1990's when Deputy Chief Phillips said, "You're going to be the H.N.I.C." The use of racial epithets, slurs, jargon and talk were made directly and indirectly to him throughout his entire career. Black officers also used the word *1207 "nigger" among themselves, which Mr. Alcorn found offensive.

b. Mr. Burns' testimony
Mr. Burns testified as follows. He began working for the City as a police officer on December 7, 1972. A racial comment concerning his marriage was made to Mr. Burns when his wife dropped him off at the police academy, shortly after he began his training as a police officer. Mr. Burns complained to the training director who later told Mr. Burns that it would not happen again. Also, while moving a truck to cut the grass at the academy, the firearm instructor said, "You're the first nigger that (sic) ever been in my truck."
During his first three and one-half years of employment with the City, Mr. Burns worked in the narcotics and intelligence divisions. While in narcotics, an officer with higher rank used the word "nigger" in his presence. Also, racial epithets were frequently used in Mr. Burns' presence.
Upon leaving narcotics, Mr. Burns was assigned to the Second District, where he sat at a desk for three months because he did not have a black partner. At times, his supervisor would send him home with pay as he was unwelcome in the precinct. While in the Second District, he worked with Sergeant Pitman who said several times that he did not like "niggers." Sergeant Pitman also said, "Let's go over to North Boulevard and arrest some niggers." Sergeant Pitman made similar comments on the police radio. Once Sergeant Pitman said, "Well, I'm going over to Gus Young and get me a couple of niggers." Mr. Burns complained about this treatment and was reassigned to the First District. The First District maintained separate cars for the black and white officers. Mr. Burns continued to complain and was transferred to Highland Road where he spent approximately one year on the "punishment beat," which was much longer than other officers stayed on that assignment.
Subsequently, in the later part of 1977, Mr. Burns went to the School Liaison Division and he worked as a school liaison until 1985. Derogatory references to black people occurred fairly frequently on the radio between 1977 and 1985. Mr. Burns complained when he recognized the voice on the police radio.
In 1989, he transferred to the Fourth District where he remained until the early 1990's when he transferred to the First District. There, he occasionally received rat-o-grams, derogatory jokes not restricted to racial subjects that were circulated by an unknown author, and received a letter from the Ku Klux Klan, also from an unknown source. He occasionally heard the term "nigger" on the police radio. Other officers, including supervisors, used the word "nigger." Mr. Burns advised his supervisor of these occurrences. Mr. Burns, then, worked in the Second District briefly before transferring to Internal Affairs.
In Internal Affairs, Deputy Chief Phillips told ethnic jokes. Mr. Burns complained of this to Deputy Chief Phillips, who said he did not mean anything by the jokes. Deputy Chief Phillips also used the word "nigger" many times. While in Internal Affairs, Mr. Burns may have told an ethnic joke about blacks to Deputy Chief Phillips. Mr. Burns told his supervisor, Lieutenant Bob Gernant, that he was offended by Deputy Chief Phillips' use of the words "honky" and "nigger." Deputy Chief Phillips also used the word "jigaboo," but Mr. Burns did not report that to Lieutenant Gernant. Mr. Burns did not discuss these matters with the Chief of Police.
While employed by the City, Mr. Burns also spent twenty-two years on the SWAT team. Members of the SWAT made racial *1208 comments, and black members were denied training. In 1992 or 1993, he became a team leader, but was removed from that supervisory position approximately two years later. Subsequently, SWAT team members sometimes referred to him as the "old black dude."

c. The City's liability for race-based harassment
Although the City disputed much of the plaintiffs' testimony at trial, after reviewing the evidence and assessing the credibility of the various witnesses, the jury concluded that Mr. Alcorn and Mr. Burns were subjected to a "hostile or abusive work environment" because of their race and that the hostile or abusive work environment was "created or permitted by a Supervisor with immediate or successively higher authority" over them. The jury further determined that the harassment resulted in the taking of a tangible employment action against each of the plaintiffs.[5]
Clearly, the jury's determinations, in this case, rested heavily on credibility issues. Credibility determinations are factual issues that will not be disturbed on appeal in the absence of manifest error. Brown v. Eppinette, 36,405, p. 10 (La.App. 2 Cir. 12/18/02), 833 So.2d 1268, 1273. As the trier of fact, a jury is free to accept or reject, in whole or in part, the testimony of any witness. Pelican Point Operations, L.L.C. v. Carroll Childers Co., 00-2770, p. 8 (La.App. 1 Cir. 2/15/02), 807 So.2d 1171, 1176, writ denied, 02-0782 (La.5/10/02), 816 So.2d 293. Such factual determinations are subject to the manifest error standard of review. Stobart v. State, Dep't of Transp. and Dev., 617 So.2d 880, 882 (La.1993). When there is a conflict in the testimony, reasonable evaluations of credibility and reasonable inferences of fact should not be disturbed upon review, although the appellate court may feel its own evaluations and inferences are as reasonable. Rosell v. ESCO, 549 So.2d 840, 844 (La.1989). The issue to be resolved by a reviewing court is not whether the trier of fact was right or wrong, but whether the factfinder's conclusion was a reasonable one. Stobart v. State, Dep't of Transp. and Dev., 617 So.2d 880, 882 (La. 1993). The reviewing court must always keep in mind that if the trial court or jury's findings are reasonable in light of the record reviewed in its entirety, the court of appeal may not reverse, even if convinced that had it been sitting as the trier of fact, it would have weighed the evidence differently. Stobart v. State, Dep't of Transp. and Dev., 617 So.2d 880, 882-83 (La.1993); Housley v. Cerise, 579 So.2d 973, 976 (La.1991); Sistler v. Liberty Mutual Ins. Co., 558 So.2d 1106, 1112 (La. 1990). Considering the record in its entirety and without restating all of the evidence of racial remarks and allegations, we find no manifest error in the jury's determination that the defendant is liable to the plaintiffs for racial discrimination.

DAMAGE AWARDS
In an action for harassment or discrimination, a plaintiff can recover loss of wages, loss of future income, medical expenses and compensatory damages. Neither Mr. Alcorn nor Mr. Burns asserted claims for lost past or future wages or for medical expenses, and the record is void of any evidence of these categories of damages. Rather, evidence in the record on the issue of damages is limited to compensatory or general damages, which encompasses mental or physical pain and suffering, inconvenience, loss of intellectual or physical enjoyment or other losses of *1209 lifestyle that cannot be measured exactly in monetary terms. The jury awarded each plaintiff $300,000 in compensatory damages for harassment and $200,000 in compensatory damages for discrimination. On appeal, the City asserts that the evidence presented to the jury was insufficient to find either plaintiff suffered any damages.
Much discretion is vested in the trial court or jury in its assessment of general damages. LSA-C.C. art. 2324.1. In reviewing an award of damages, the court of appeal must determine whether the trier of fact has abused its much discretion in making the award. Turner v. Ostrowe, 01-1935, p. 5 (La.App. 1 Cir. 9/27/02), 828 So.2d 1212, 1216, writ denied, 02-2940 (La.2/7/03), 836 So.2d 107, citing Youn v. Maritime Overseas Corp., 623 So.2d 1257, 1260 (La.1993), cert. denied, 510 U.S. 1114, 114 S.Ct. 1059, 127 L.Ed.2d 379 (1994). The discretion vested in the trier of fact is "great," and even vast, so that an appellate court should rarely disturb an award of general damages. Youn v. Maritime Overseas Corp., 623 So.2d 1257, 1261 (La.1993), cert. denied, 510 U.S. 1114, 114 S.Ct. 1059, 127 L.Ed.2d 379 (1994). It is only when the award is, in either direction, beyond that which a reasonable trier of fact could assess for the effects of the particular injury to the particular plaintiff under the particular circumstances that the appellate court should increase or reduce the award. Youn v. Maritime Overseas Corp., 623 So.2d 1257, 1261 (La.1993), cert. denied, 510 U.S. 1114, 114 S.Ct. 1059, 127 L.Ed.2d 379 (1994); Turner v. Ostrowe, 01-1935, p. 5 (La.App. 1 Cir. 9/27/02), 828 So.2d 1212, 1216, writ denied, 02-2940 (La.2/7/03), 836 So.2d 107. After a determination that the trier of fact has abused its "much discretion," an appellate court can only adjust the award to the highest or lowest point that is reasonably within that discretion. Duncan v. Kansas City Southern Railway Co., 00-0066, p. 14 (La.10/30/00), 773 So.2d 670, 683, cert. dismissed, 532 U.S. 992, 121 S.Ct. 1651, 149 L.Ed.2d 508 (2001).
At trial, each plaintiff testified to the great degree of mental pain and suffering he experienced as a result of the conditions of his employment. Also, the actions taken by each plaintiff in attempting to avoid or rectify the race-based harassment and racial discrimination prevalent throughout his career show the level to which each was subjected to mental pain and suffering.
Mr. Alcorn testified that he suffered with sleepless nights. Although he was unable to identify the year the sleeplessness began, he noted that it cleared up a couple of years after he left Internal Affairs. Mr. Alcorn further testified that he suffered with headaches while assigned to Internal Affairs. Mr. Alcorn also stated that he experienced stomachaches, nervousness and some depression. He offered no further elaboration on these conditions or symptoms, except to note that he did not seek counseling for the depression. He also stated that he suffered embarrassment as a result of the racial remarks. Mr. Alcorn testified that, while he worked in Internal Affairs, it was very difficult to "be relegated on a daily basis to less than a second class citizen by the Deputy Chief of Police" and that "it got to the point where it was unbearable to go to work."
Mr. Burns testified that, as a result of his working conditions, he was "grumpy," suffered with high blood pressure, withdrew from friends, and could not sleep. Mr. Burns testified that the actions of the City caused him to seek medical attention. Mr. Burns testified that a doctor diagnosed him with high blood pressure and prescribed medication. He also testified that he "withdrew from a lot of things, visiting friends." He stated, "I spent a lot *1210 of time on the boat because I was awake all the time."
Considering the totality of the evidence presented by the plaintiffs, we conclude that the jury's general damage awards do not constitute an abuse of the "much discretion" of the trier of fact because they are not excessive "for the particular injuries and their effects under the particular circumstances on the particular injured." Youn v. Maritime Overseas Corp., 623 So.2d 1257, 1260 (La.1993), cert. denied, 510 U.S. 1114, 114 S.Ct. 1059, 127 L.Ed.2d 379 (1994). An appellate court's role in reviewing general damage awards is not to decide what it considers to be an appropriate award, but rather to review the exercise of discretion by the trier of fact. Reck v. Stevens, 373 So.2d 498, 504 (La.1979). Accordingly, the jury's awards of general damages to Mr. Alcorn and Mr. Burns are affirmed.

CONCLUSION
For the foregoing reasons, the trial court's award of $50,000 to William Alcorn for unlawful retaliation is reversed. In all other respects, the judgment of the trial court is affirmed. Costs in the sum of $13,885.58 are to be shared equally by the City of Baton Rouge, through the Baton Rouge Police Department and William Alcorn.
REVERSED IN PART AND AFFIRMED IN PART.
NOTES
[1] Hon. William F. Kline Jr., retired, is serving as judge pro tempore by special appointment of the Louisiana Supreme Court.
[2] Initially, Burns also asserted a claim of unlawful retaliation. However, at the beginning of trial, the trial judge severed that claim, and it is not part of this appeal.
[3] In reversing the grant of summary judgment on the race-based discrimination, harassment and retaliation claims, this court determined that genuine and numerous issues of material fact, requiring credibility determinations and the resolution of conflicting testimony, remained; therefore, summary judgment was inappropriate.
[4] Although the City asserted in an assignment of error that the jury erred in finding it liable to the plaintiffs for both racial discrimination and harassment, it failed to brief the issue of its liability for racial discrimination. Therefore, pursuant to the Uniform Rules, Court of Appeal, Rule 2-12.4, we find that this assignment of error has been abandoned. See Devers v. Southern University, 97-259, p. 13 (La.
[5] The term "tangible employment action" includes a significant change in employment status, such as hiring, firing, and failing to promote, the reassignment with significantly different responsibilities, and a decision causing a significant change in benefits.